**STATE of Minnesota, Respondent,**

v.

**Meng VANG, Appellant.**

No. A08–588.

Supreme Court of Minnesota.

Oct. 29, 2009.

See also, *State v. Yang,* 774 N.W.2d 539, 2009 WL 3461151.

Lori Swanson, Attorney General, St. Paul, Minnesota; and Robert M.A. Johnson, Anoka County Attorney, Marcy S. Crain, Assistant Anoka County Attorney, Anoka, MN, for respondent.

Roy G. Spurbeck, Assistant State Public Defender, St. Paul, MN, for appellant.

## OPINION

DIETZEN, Justice.

Appellant Meng Vang was convicted of two counts of aiding and abetting first-degree premeditated murder and two counts of aiding and abetting first-degree premeditated murder for the benefit of a gang for the shooting and resulting deaths of Tashi Jagottsang and Bunsean Lieng. *See* Minn.Stat. §§ 609.05, 609.185(a)(1), 609.229, subd. 2 (2008). Additionally, appellant was convicted of four counts of aiding and abetting attempted first-degree premeditated murder and four counts of aiding and abetting attempted first-degree premeditated murder for the benefit of a gang for the shooting and resulting injuries to Tenzin Tsondu, Tenzin Phelgye Woser, Tenzin Tenpa, and Tenzin Choegyal. *See* Minn.Stat. §§ 609.05, 609.185(a)(1), 609.229, subd. 2, 609.17 (2008). The district court entered judgments of conviction and sentenced appellant to two life terms for aiding and abetting the first-degree murders for the benefit of a gang of Tashi Jagottsang and Bunsean Lieng. It imposed consecutive

186–month sentences for the attempted first-degree murder for the benefit of a gang for the offenses against Tenzin Tsondu, Tenzin Phelgye Woser, Tenzin Tenpa, and Tenzin Choegyal.

In this direct appeal, appellant argues that (1) the district court abused its discretion by admitting gang expert testimony; (2) the district court's jury instruction on accomplice liability materially misstated the law; (3) the district court abused its discretion regarding certain evidentiary rulings; (4) the evidence was not sufficient to establish that the murders and attempted murders were premeditated; and (5) the district court abused its discretion when it imposed consecutive sentences. We affirm.

About 10:00 p.m. on February 3, 2005, police responded to a report that a fight had erupted at Jimmy's Pro Billiards (Jimmy's) in Columbia Heights and that shots had been fired.[1] Within seconds, Officer Greg Sinn arrived on the scene and observed a body, later identified as Bunsean Lieng, lying on the floor of a parking ramp about 60 feet from the pool hall. Lieng had suffered a fatal gunshot wound to the head. A few seconds after arriving at the scene, Sinn saw a black Honda with its lights off exit the parking ramp going the wrong way. A police car driven by Officer Matt Aish arrived a few seconds later. Officer Aish saw the black Honda quickly accelerate through a stop sign onto a city street.

Officer Aish stopped the black Honda. Jason Moua was driving the black Honda, and Helene Yang and appellant were passengers. Police found a blue bandana and a box of .38 caliber Winchester ammunition in the black Honda. About half a block away from Jimmy's, police found a 9mm Taurus handgun lying in a snowbank.

At the same time, police also stopped a dark blue Honda Civic about one block from the location of the stopped black Honda. Sai Vang was the driver, and Charles Yang and Grogan Yang were the passengers. In the dark blue Honda Civic, police found a 9mm Jennings handgun, a .38 revolver, a .357 Magnum revolver, and spent casings under the seats.

In a small park nearby, police found the body of Tashi Jagottsang. Jagottsang had sustained multiple wounds that were consistent with bullets fired from a .357, .38, or 9mm handgun; he died from the injuries. Tenzin Tsondu, Tenzin Phelgye Woser, Tenzin Tenpa, and Tenzin Choegyal were also injured from gunshot wounds arising out of the same incident. These victims were all Tibetan men, with the exception of Bunsean Lieng, who was Cambodian.

Subsequent ballistics testing confirmed that cartridge casings recovered from the parking ramp behind the pool hall had been fired from the 9mm Taurus handgun found in the snowbank, and the spent casings found under the seat of the dark blue Honda Civic had been fired from the 9mm Jennings pistol.

Nine days later police stopped a maroon Acura driven by Richard Vang and owned by Yatau Her. This car had been seen at Jimmy's on the night of the incident. Police discovered a silver and black Smith and Wesson handgun in the car. Testing showed that this gun had fired nine spent

---

1. We note that we have decided a separate appeal arising from this incident, *State v. Yang*, Case Nos. A07–121, A08–1464, 774 N.W.2d 539 (Minn. Oct. 29, 2009), which involved a separate trial. Because witness testimony varied slightly between the two trials, and because some witnesses were called in one trial and not the other, there is a slight variation between the description of the incident in *Yang* and the description provided here.

cartridge casings found in the alley behind Jimmy's, as well as a bullet recovered from Tenzin Choegyal's clothing.

Police executed search warrants at the homes of Sai Vang, Jason Moua, Charles and Grogan Yang, and at a residence associated with appellant. Subsequently, appellant was indicted. Before trial, appellant brought a motion to prohibit Officer Richard Straka from presenting expert gang testimony on the ground that the testimony would violate his right of confrontation under state and federal law.[2] The district court deferred ruling on the motion until after the State had finished its lay witness testimony.

At trial, the State presented testimony regarding certain events that led up to the incident at Jimmy's. Specifically, the State showed that a few weeks before the incident in question Jason Moua, who is a MOD gang member, and Lue Vang were involved in a fight with a group of about 10 Hmong men outside a bowling alley. Both Moua and Vang were injured, and Vang was hospitalized for four days. To celebrate his recovery, Vang planned a barbeque with his cousins.

A few days later, Lue Vang and Sai Vang, who are cousins, went to a St. Paul motel to visit Sai Vang's cousin from California. Appellant, Jason Moua, Charles and Grogan Yang, Xee Lor, and others were also present that evening. Lue Vang told the group that Moua and he had been involved in a fight with a gang of Hmong men at a local bowling alley. Moua also gave Sai Vang a loaded 9mm handgun, which Vang put under the driver's seat of his dark blue Honda Civic.

The next evening, Lue Vang had the barbeque. Appellant, Jason Moua, Sai Vang, Charles and Grogan Yang, Helene Yang, and Xee Lor, among others, were at the barbeque. At one point, several members of the group decided to go to Jimmy's Billiards. They left in three cars. Moua drove a black Honda with Helene Yang and appellant as passengers, Sai Vang drove a dark blue Honda Civic with Charles and Grogan Yang as passengers, and Yatau Her drove a maroon Acura with Xee Lor and Fong Vang as passengers.

At the same time, a group of Tibetans was playing pool at Jimmy's. At one point, several of the Tibetans stepped out of the pool hall and into the adjoining alley. As two of the Tibetans walked to their car, a car carrying several Asian men pulled up. The men in the car began to scream at the Tibetans. A third Tibetan, Jampa Ritzekura, approached the car to intercede. One of the passengers made hand signs and screamed, "What do you claim?" The Tibetans answered "we don't claim nothing" and walked away.

A few Tibetans left the parking ramp in a car, but then returned to meet Bunsean Lieng and other Tibetans. After discussing what had happened, several of the Tibetans decided to return to the pool hall to talk to the Asian men. Once inside the pool hall, Jampa Ritzekura identified Grogan Yang as one of the people who had confronted him outside the pool hall. As the Tibetans approached Grogan Yang and his companions, including appellant, a fight erupted between the two groups. Witnesses stated that pool balls and cue sticks were flying. Subsequently, the Tibetans ran out of the pool hall into the alley and fled in different directions. Grogan Yang, appellant, and other MOD members chased after the Tibetans. Multiple gunshots were fired, both in the alley behind Jimmy's and in the parking lot. One of the Tibetans, Tenzin Yulme, testified that

---

**2.** The appellant also asked for a *Frye–Mack* hearing on Officer Straka's proposed testimony. The district court declined that request, and that issue is not before this court.

Bunsean Lieng was shot in the parking ramp by a man matching appellant's description, that the shooter got into a car, and that the car left the scene with its tires screeching.

Helene Yang, who is the wife of Jason Moua, testified pursuant to a plea agreement. She stated that she saw appellant shoot a Tibetan man in the parking ramp and saw the man fall to the ground. Subsequently, she and appellant got into Moua's car, and Moua drove the car out of the parking ramp going the wrong way at high speed. She testified that appellant, Jason Moua, Charles Yang, Grogan Yang, Xee Lor, and Yatau Her are members of MOD. She also stated that MOD means "Menace of Destruction" and baby blue is the color of MOD. But she refused to testify as to the meaning or connection of the number "301" to the MOD or to the specific hand signs associated with MOD.

Sai Vang, who also testified pursuant to a plea agreement, stated that he heard 7–10 shots coming from the alley as he ran to his car. He testified that he saw Grogan Yang shooting at the fleeing Tibetans. Sai Vang also testified that MOD means "Menace of Destruction." He testified that Jason Moua, Yatau Her, Charles Yang, and Grogan Yang are MOD members. He refused to testify about MOD's identifying colors or hand signs.

Other lay witnesses testified about the MOD's identifying colors and hand signs, that members of the MOD had been convicted of crimes committed for the benefit of a gang, and that the acronym MOD stands for "Menace of Destruction." But those witnesses were also evasive in some respects about the MOD. For example, one witness evaded questions asking him to identify fellow MOD members and explain

paraphernalia, including hats and rap CDs associated with MOD.

When the State called Officer Richard Straka to testify as a gang expert, appellant objected on the grounds that his testimony would be hearsay and violated his right to confrontation under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The district court overruled the objections and allowed the testimony.

Officer Straka, who is employed by the gang unit of the St. Paul Police Department, testified that he has been a police officer for 22 years and has specialized training regarding criminal street gangs dating back to about 1997. Straka explained that the Minnesota Gang Strike Force [3] collects information on gangs and gang members, and described how the strike force records that information on field-interview cards. According to Straka, "in order to be a gang you have to have power," and that if you are not powerful or strong, other gangs will be "constantly picking on you, fighting with you, shooting at you."

Straka described Asian gangs in Minnesota, particularly the MOD. He testified that MOD stands for Menace of Destruction, Masters of Destruction, or Men of Destruction, depending on the state in which the gang is located. The number "301" relates to the hand sign for MOD— "3" represents "M," "0" represents "O," and "1" represents "D." Minnesota's MOD colors are primarily blue. The MOD gang has several websites that it uses to communicate and to post photographs of gang members "throwing" hand signs and showing guns. After the pool hall shootings, the MOD website posted booking photos of six people arrested in the pool hall shoot-

---

**3.** It was subsequently renamed the Metro Gang Strike Force.

ing, including appellant, as well as television news footage about the incident.

According to Straka, he met with appellant about six days before the pool hall incident. During that meeting, appellant told Straka that "a lot of gangs hate us, the MOD." He informed Straka that when 10 MOD members get together, there is "going to be trouble." Straka met with Charles Yang, who told him that he and appellant were members of the MOD gang. Straka testified that Xee Lor, Fong Vang, and Richard Vang are MOD gang members. Straka also identified numerous admitted MOD members and their convictions for crimes committed "for the benefit of a gang."

Finally, the State called two jailhouse informants as witnesses. Donald Gardner, who was incarcerated with appellant, testified that he overheard appellant tell another inmate that appellant and others went to the pool hall, got into a confrontation with a rival gang and a fight broke out, and appellant started shooting. He also overheard appellant state they got rid of the guns "behind a building or a church," and that nobody messes with him and the MOD. Gardner also testified that he saw appellant "throw gang signs" as he walked past Jason Moua in the prison.

Sincere Page–El, who was also incarcerated with appellant, testified that he overheard appellant tell another inmate that after the fight at the pool hall, appellant and Fong Vang grabbed handguns and started shooting at others outside the pool hall. According to Page–El, appellant stated that he and "Squid"[4] left the area of the shootings in two cars and threw

their guns (except for the chrome gun) by the church.

The jury found appellant guilty of all twelve counts as charged. The district court entered judgments of conviction, imposed two life-term sentences for the aiding-and-abetting first-degree murder for the benefit of a gang convictions, and imposed consecutive 186–month sentences for the attempted first-degree murder for the benefit of a gang convictions. This appeal followed.

### I.

Appellant contends that the district court erred when it admitted Officer Straka's testimony because it (1) was unnecessary and cumulative to the testimony of lay witnesses, (2) violated the Confrontation Clause and was based on inadmissible hearsay, and (3) improperly expressed legal opinions. We address each contention in turn.

#### A. Cumulative Testimony

According to appellant, Officer Straka's testimony duplicated lay witness testimony about appellant's MOD affiliation, and therefore its probative value was outweighed by its prejudicial effect. The State counters that Straka's testimony was not needlessly cumulative because the lay witnesses were not forthcoming about the MOD or about appellant's gang affiliation.

The State charged appellant with six counts of crime for the benefit of a gang, in violation of Minn.Stat. § 609.229, subd. 2 (2008). As part of this offense, the State had the burden of proving that Vang committed a crime "for the benefit of, at the direction of, in association with, or motivated by involvement with a criminal gang"[5]

**4.** Fong Vang's nickname is "Squid."

**5.** Minnesota Statutes § 609.229, subd. 1 (2008), defines "criminal gang" as:

any ongoing organization, association, or group of three or more persons, whether formal or informal, that:

and acted "with the intent to promote, further, or assist in criminal conduct by gang members." *Id.*

Minnesota Rule of Evidence 702 provides that an expert may testify "in the form of an opinion" if his or her "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." The "ultimate question of admissibility" under Rule 702 is whether the expert's testimony will help the jury evaluate evidence or resolve factual issues. *State v. DeShay*, 669 N.W.2d 878, 887 (Minn.2003) (internal quotation marks omitted). In addition, Minn. R. Evid. 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

We review evidentiary rulings, including rulings on gang expert testimony, for an abuse of discretion. *State v. Mahkuk*, 736 N.W.2d 675, 686 (Minn.2007). This court prefers that "first-hand knowledge testimony be used to prove the 'for the benefit of a gang' element when feasible." *State v. Jackson*, 714 N.W.2d 681, 691 (Minn.2006). But the State may offer gang expert testimony when a defendant has been charged with committing a crime for the benefit of a gang. *See id.* Gang expert testimony that duplicates first-hand knowledge testimony should be avoided. *Id.* Accordingly, gang expert testimony is admissible only where it adds "precision or depth to the jury's ability to reach conclu-

sions about matters that are not within its experience." *DeShay*, 669 N.W.2d at 888.

If testimony was erroneously admitted, we review for harmless error. *See State v. Valtierra*, 718 N.W.2d 425, 435 (Minn.2006). If no constitutional right was implicated, we will reverse only if the district court's error "substantially influence[d] the jury's decision." *DeShay*, 669 N.W.2d at 888. But if the erroneous admission of evidence violated the defendant's constitutional rights, we will reverse unless the jury verdict was "surely unattributable" to the error. *See Valtierra*, 718 N.W.2d at 435 n. 4.

Appellant's defense was that he was not associated with the MOD and that he did not commit a crime for the benefit of a criminal gang. Thus, Straka's testimony explaining why the MOD gang responded to the incident in which Jason Moua and Lue Vang were injured added precision and depth to the jury's ability to reach conclusions on matters not within their everyday experience. Further, testimony describing the nature and extent of the criminal activities of the MOD, and information about the MOD's criminal activities contained on its website were important facts necessary to provide a context for the State's case, as well as to establish the elements of the for-the-benefit-of-a-gang statute.

Officer Straka's testimony about the identifying colors, symbols, and hand signs of the MOD, and testimony identifying appellant as a member of MOD, duplicated the testimony of some of the lay witnesses. Although this testimony was

(1) has, as one of its primary activities, the commission of one or more of the offenses listed in section 609.11, subdivision 9;
(2) has a common name or common identifying sign or symbol; and

(3) includes members who individually or collectively engage in or have engaged in a pattern of criminal activity.
It is undisputed that the offenses described in the State's case fall within the offenses listed in section 609.11, subdivision 9.

relevant under Minn. R. Evid. 401, it was also cumulative under Minn. R. Evid. 403. Here, the district court deferred making a ruling on the admissibility of this evidence until after the State's witnesses had testified and then exercised its discretion in favor of admitting the evidence. Based on our review of the record, we cannot conclude that the danger of unfair prejudice or the other considerations under Rule 403 required exclusion of the evidence. Thus, the district court did not abuse its discretion.

■■■ But even if this evidence was erroneously admitted, we conclude that any error was harmless. There was ample evidence, other than Straka's testimony, that described the colors, symbols, and hand signs of the MOD. Moreover, Helene Yang and Bau Yang both testified that appellant was associated with the MOD, and appellant's statement to Straka that "lots of gangs hate us, the MOD," was an implicit acknowledgement by appellant that he is associated with the MOD.

### B. Confrontation Clause and Hearsay Objections

■■■ Appellant argues that Officer Straka's testimony violated *Crawford* and was inadmissible hearsay. Specifically, appellant argues that Straka repeated statements contained on an interview card prepared by another Strike Force member for an interview of Charles Yang to support Straka's statement that appellant was a member of the MOD. Similarly, Straka repeated statements made by other individuals to prove that they were MOD members.

Under the Sixth Amendment's Confrontation Clause, a criminal defendant has the right to confront the witnesses against him. In *Crawford v. Washington*, 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court held that the Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination."

■■■ The threshold question for a *Crawford* analysis is whether the statements at issue are testimonial. In *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the Supreme Court revisited *Crawford* and established guidelines for determining when statements made to police are testimonial. The Court explained:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.*

■■■ The State asks us to assume without deciding that the disputed testimony violated *Crawford* and argues that the admission of these statements was harmless. As a result, we consider whether the error was harmless under our constitutional standard and examine whether the verdict was "surely unattributable" to the disputed evidence. *State v. Courtney*, 696 N.W.2d 73, 79–80 (Minn.2005). In determining whether a jury verdict was "surely unattributable" to an erroneous admission of evidence, we consider (1) the manner in which the evidence was presented, (2) whether it was highly persuasive, (3) whether it was used in closing argument,

(4) whether it was effectively countered by the defendant, and (5) whether other evidence of guilt was overwhelming. *State v. Al–Naseer*, 690 N.W.2d 744, 748 (Minn. 2005).

■ Appellant argues that because the evidence was presented by a police officer, it was highly persuasive to the jury and therefore was prejudicial. We agree that the testimony of a police expert on its face could be persuasive. But the jury was instructed to give the testimony of an expert no greater weight than that of a lay witness. We assume that the jury followed the court's instructions and properly considered the evidence. *State v. Ferguson*, 581 N.W.2d 824, 833 (Minn.1998).

Further, the State did not rely on Straka's disputed testimony during closing arguments to argue that appellant was associated with the MOD. More importantly, the other evidence presented by the State that appellant was a member of the MOD was overwhelming. Specifically, Helene Yang and Bau Yang testified that appellant was a member of the MOD, and appellant told Officer Straka that "lots of gangs hate us, the MOD," which implicitly connects appellant to the MOD.[6] Further, the physical evidence seized from appellant's house connected him to the MOD. Additionally, the evidence that supports appellant's convictions is overwhelming. The State presented testimony that appellant was at a St. Paul motel and Lue Vang's barbeque, that appellant was at Jimmy's when the fight erupted with the Tibetans, that appellant participated in chasing the Tibetans into the alley, and that appellant shot and killed Bunsean Lieng. We conclude that the jury verdict was surely unattributable to Straka's testimony in which he repeated out-of-court statements by nonwitnesses that appellant was a member of the MOD, and therefore admission of this testimony was harmless beyond a reasonable doubt.

■ Appellant argues that even if these statements did not violate *Crawford*, the statements were inadmissible hearsay and should have been excluded. We agree that Straka's testimony was offered to prove appellant's association with the MOD and therefore was hearsay. Because the erroneously admitted evidence does not involve a constitutional issue, our standard of review focuses on whether the erroneously admitted evidence substantially influenced the jury verdict. Given our previous conclusion that the admission of the statements was not harmful under the stricter "harmless beyond a reasonable doubt" standard, it necessarily follows that the evidentiary error is also harmless under the alternative standard.

### C. Expert Opinion

■ Appellant argues that the district court erred in allowing Officer Straka to express his opinion that the activities of the MOD met the definition of a "pattern of criminal behavior" under Minn.Stat. § 609.902, subd. 6 (2008).[7]

■ Under Minn. R. Evid. 704, an expert may give his or her opinion as to an ultimate fact issue in the case if such testimony is helpful to the fact-finder. Expert opinion testimony is not helpful if "the subject of the testimony is within the knowledge and experience of a lay jury and the testimony of the expert will not

---

**6.** Appellant does not contend that admitting his own statements violates the Confrontation Clause. His statements are not inadmissible hearsay because they are party admissions admissible under Minn. R. Evid. 801(d)(2)(A).

**7.** Appellant objected to this opinion question at trial but did not state the basis for his objection and was overruled.

add precision or depth to the jury's ability to reach conclusions about that subject which is within their experience." *State v. Moore*, 699 N.W.2d 733, 740 (Minn.2005) (internal quotation marks omitted). In *Moore*, we held that the trial court had erred by allowing a medical doctor to express her expert opinion that an assault victim's injuries met the legal definition of great bodily harm, which was an element of first-degree assault. *Id.* The court concluded that, while ultimate opinion testimony is admissible, the manner in which the doctor's testimony was elicited was not helpful to the jury because it "merely [told] the jury what result to reach." *Id.* (internal quotation marks omitted); *see also State v. Saldana*, 324 N.W.2d 227, 230–31, 231 n. 5 (Minn.1982) (holding that expert's conclusion that victim was "raped" was a legal conclusion which was of no use to the jury and explaining that "opinions involving a legal analysis or mixed questions of law and fact are deemed to be of no use to the jury").

Before Officer Straka testified, the district court granted appellant a "standing objection" to his testimony. At issue is the following testimony:

> Q. Do you have an opinion based on your training and experience as to whether or not members of the MOD gang have individually or collectively engaged in a pattern of criminal behavior?
>
> . . . .
>
> A. Yes I do.
>
> Q. What is that opinion?
>
> A. That members of the MOD gang do individually and collectively engage in a pattern of criminal activity, violent criminal activity, under statute 609, which includes aggravated assaults, drive-by shootings, possession of guns by ineligibles, criminal sexual conduct, auto theft, narcotics and other crimes.

Minnesota Statutes § 609.229, subd. 1 (2008), defines a "criminal gang" and sets forth three criteria. Subdivision 1(3) provides that a criminal gang "includes members who individually or collectively engage in a pattern of criminal behavior." The court used the language of subdivision 1(3) to instruct the jury as to the meaning of a criminal gang. And it is this language that the jury would consider in its deliberations of whether the MOD is a criminal gang under the statute.

Both the question and Officer Straka's answer use the language of subdivision 1(3) almost verbatim. More importantly, by referencing "statute 609" in his answer, Straka expressed a legal conclusion that the third prong of Minn.Stat. § 609.229, subd. 1, had been met. It is not objectionable for an expert to express that individual members of the MOD have engaged in specific criminal activities, and he or she can reveal the facts underlying the basis for that opinion if they are independently admissible. *See* Minn. R. Evid. 703. But we conclude that Straka's testimony expressed a legal opinion that invaded the province of the jury and "merely [told] the jury what result to reach." *Moore*, 699 N.W.2d at 740 (internal quotation marks omitted).

■ Thus, we must consider whether the opinion testimony that the MOD is a criminal gang was harmful. Our analysis focuses on how the testimony was used and its impact on the jury. The State did not rely on the testimony in its closing argument. More importantly, the evidence that the MOD was a criminal gang was substantial. Moreover, the district court instructed the jury that expert opinion evidence is entitled to "neither more nor less consideration by you than any other evidence." This instruction presumably minimized any prejudice appellant suffered from Straka's improper legal

opinion. For these reasons we conclude that any error in admitting Straka's statement of legal opinion was harmless.

## II.

■ Appellant argues that the district court erred in making two other evidentiary rulings and in refusing his request for a jury instruction. First, he argues that the district court erred in permitting the State to question two of its witnesses about threats against them and their fear of retribution for testifying.

■ We review a district court's evidentiary rulings under an abuse of discretion standard. *State v. McArthur*, 730 N.W.2d 44, 51 (Minn.2007). We review a district court's refusal to give a requested jury instruction for an abuse of discretion. *Id.* at 52. A party is entitled to an instruction only if the evidence supports it. *State v. Richardson*, 393 N.W.2d 657, 665 (Minn. 1986).

■ Relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Minn. R. Evid. 403. Evidence of a witness's fear of testifying and purported threats against that witness are relevant to determine witness credibility, and to explain a witness's reluctance to testify, or inconsistencies in a witness's testimony. *McArthur*, 730 N.W.2d at 52.

On direct examination, Lue Vang stated that he had concerns about his safety because MOD members knew where he lived. He did not testify as to any direct threats against him. Sai Vang testified that Charles Yang had threatened him and his family, but he made clear that appellant had not threatened him.

Here, no evidence suggests appellant threatened Sai Vang or Lue Vang. Nonetheless, testimony about their fears was relevant to explain their reluctance to testify and provide details about appellant and the MOD. For this reason, we conclude that these statements were not erroneously admitted. Furthermore, the statements did not implicate appellant, and therefore any potential prejudice to appellant was limited.

■ Second, appellant argues that the court erred in excluding evidence explaining the incentives that exist in the federal sentencing system for federal inmates to provide information in other cases. Appellant specifically argues that he should have been able to provide evidence to the jury that federal defendants Sincere Page–El and Donald Gardner might get their sentences reduced by cooperating with authorities. We conclude that the court did not abuse its discretion in excluding evidence of possible federal sentencing incentives for jailhouse informants. Because there was no showing that Page–El or Gardner had agreed to testify in exchange for a sentence reduction, general information about federal sentencing incentives for jailhouse informants was not probative. It was properly excluded under Minn. R. Evid. 402.

Third, appellant argues that the district court erred in denying his request for a special jury instruction requiring corroboration for an informant's testimony before a conviction could be based on that testimony. Minnesota law does not require corroboration of nonaccomplice testimony. *See* Minn.Stat. § 634.04 (2008) ("A conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense. . . ."). Appellant provides no case law that suggests such an instruction was necessary or even appropriate. We have observed that "the accomplice testimony rule is based on the fear of self-serving

dishonesty by accomplice witnesses." *State v. Clark,* 755 N.W.2d 241, 253 (Minn. 2008). No such concern is evident from the record. Further, substantial evidence provided by numerous other witnesses *did* corroborate the testimony of the informants.

### III.

Appellant argues that the district court improperly gave the jury the 1999 version of the pattern jury instruction for accomplice liability. The State counters that because appellant did not object to the jury instruction at trial, he is barred from raising the issue on appeal and that any error was harmless.

 Failure to object to jury instructions may result in a waiver of the issue on appeal. *State v. Crowsbreast,* 629 N.W.2d 433, 437 (Minn.2001). But we have discretion to examine instructions that were not objected to at trial "if the instructions contain plain error affecting substantial rights or an error of fundamental law." *State v. White,* 684 N.W.2d 500, 508 (Minn.2004). Plain error analysis involves a three-prong test that requires: (1) an error; (2) that is plain; and (3) affects substantial rights. *State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998). An error affects substantial rights if there is a reasonable likelihood that the error had a significant effect on the jury's verdict. *State v. Vance,* 734 N.W.2d 650, 656 (Minn. 2007). Each prong of the plain error test must be satisfied in order for the error to be corrected. *Id.* If these three prongs are met, this court then assesses whether we should address the error to ensure fairness and the integrity of the judicial proceedings. *Id.*

 A district court errs when its instructions confuse, mislead, or materially misstate the law. *See State v. Gutierrez,* 667 N.W.2d 426, 434 (Minn.2003). But a district court's instructions must be read as a whole to determine whether they accurately describe the law.

Essentially, appellant makes two arguments. First, he argues the jury instruction was inconsistent with the State's theory of the case that he intentionally aided the murder of two victims and the attempted murder of four other victims. All of the charges against appellant asserted aiding and abetting liability under Minn. Stat. § 609.05. The relevant portions of the statute provide:

> Subd. 1. A person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime.

> Subd. 2. A person liable under subdivision 1 is also liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable by the person as a probable consequence of committing or attempting to commit the crime intended.

*Id.,* subds. 1, 2.

Pursuant to this statutory language, the district court issued a jury instruction that followed verbatim the recommended language on accomplice liability from the 1999 version of the Jury Instruction Guide. *See* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG 4.01 (4th ed.1999).

Appellant argues that because the charging document listed a specific victim for each charge, Minn.Stat. § 609.05, subd. 2, is not applicable. The State argues that the indictment refers to "Minn.Stat. § 609.05," which encompasses subdivisions 1 *and* 2 of the statute, and therefore the charging document permitted the State to argue reasonable foreseeability.

582

Section 609.05 does not set forth mutually exclusive standards of liability, but instead provides that if a defendant is culpable under subdivision 1, he may also be culpable under subdivision 2 if certain conditions are met. The charging documents cited Minn.Stat. § 609.05 and did not specify either subdivision 1 or 2. Because this was a general reference, we conclude that the charge included both subdivision 1 and subdivision 2. Accordingly, we conclude that the district court did not err by instructing the jury on accomplice liability based on language from subdivisions 1 and 2 of section 609.05.

■ Second, appellant argues that the district court erred in its accomplice liability instruction under subdivision 2 by using the phrase "reasonably foreseeable" rather than "reasonably foreseeable to the person." In *State v. Earl*, we considered the same jury instruction on accomplice liability that was given in Vang's case and concluded it was not error. *State v. Earl*, 702 N.W.2d 711, 722 (Minn.2005). Earl argued that the 1999 version of CRIMJIG 4.01 contained the phrase "reasonably foreseeable" but Minn.Stat. § 609.05, subd. 2 (2008), contained the phrase "reasonably foreseeable by the person [liable for aiding and abetting]," and therefore there was a conflict between the two. *Earl*, 702 N.W.2d at 721.

We held that even though the language of the instruction did not match the language of the statute, the district court did not err. *Id.* We noted that in previous cases we had found similar instructions not erroneous but that in other cases we had, and that in Earl's case the State had asserted the theory that the murders were foreseeable to Earl. *Id.* We "suggested" that "to avoid the necessity of dealing with this issue in the future ... instructions on accomplice liability [should] use the entire statutory phrase 'reasonably foreseeable to

the person.'" *Id.* at 722. In 2006, CRIMJIG 4.01 was amended to incorporate our suggested language. 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 4.01 (5th ed.2006).

■ Once again, we urge the district court to write its jury instruction on aiding and abetting such that it mirrors the language of the statute. Nonetheless, we do not conclude that failure to do so automatically constitutes plain error that affects a defendant's substantial rights.

Here, the State's theory of the case, and its closing argument, focused on proving that the crimes committed by the other gang members were reasonably foreseeable to appellant. During closing argument the State argued, "[W]as it reasonably foreseeable that someone would die when you have a gun and you're shooting down the alley? You bet." Because the record shows that the State's evidence focused on what *appellant* foresaw, we conclude his substantial rights were not affected. Thus, any error in issuing the jury instruction does not entitle appellant to a new trial.

IV.

■ Appellant argues that the State's evidence was insufficient to prove premeditation beyond a reasonable doubt, and therefore his convictions for aiding and abetting first-degree premeditated murder and aiding and abetting attempted first-degree premeditated murder should be vacated. Specifically, appellant contends that there are no statements by him indicating premeditation, there is no evidence of conduct after the killing that indicates premeditation on his part, and the State's only evidence of premeditation is the manner and number of shots fired, which alone are insufficient to show premeditation.

When reviewing a claim of insufficient evidence, "we view the evidence in the light most favorable to the verdict and assume that the fact-finder disbelieved any testimony conflicting with that verdict." *State v. Chomnarith*, 654 N.W.2d 660, 664 (Minn.2003). "The verdict will not be overturned if, giving due regard to the presumption of innocence and the prosecution's burden of proving guilt beyond a reasonable doubt, the jury could reasonably have found the defendant guilty of the charged offense." *Id.*

A person who "causes the death of a human being with premeditation and with intent to effect the death of the person" is guilty of first-degree murder. Minn.Stat. § 609.185(a)(1) (2008). Premeditation means "to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Minn.Stat. § 609.18 (2008). Premeditation "requires some amount of time to pass between formation of the intent and the carrying out of the act." *State v. Hughes*, 749 N.W.2d 307, 312 n. 2 (Minn.2008) (citation omitted) (internal quotation marks omitted). But proving premeditation does not require "proof of extensive planning or preparation to kill," nor does it "require any specific period of time for deliberation." *Id.* (internal quotation marks omitted). Multiple gunshot wounds and the brutality of the killing may be evidence of premeditation. *State v. Moua*, 678 N.W.2d 29, 41 (Minn.2004).

Premeditation is "generally proven through circumstantial evidence" and often inferred from the totality of circumstances surrounding the killing. *Hughes*, 749 N.W.2d at 312 (quoting *State v. Leake*, 699 N.W.2d 312, 321 (Minn. 2005)). "Circumstantial evidence is entitled to the same weight as any other evidence," but in order to support a conviction, the circumstances proved must be "consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis other than guilt." *Leake*, 699 N.W.2d at 319. We recognize three categories of evidence relevant to an inference of premeditation: planning activity, motive, and the nature of the killing. *Hughes*, 749 N.W.2d at 313. We have considered evidence that a defendant "[made] the decision to chase after [the victim]" and fire two or three shots after the initial volley, as evidence of premeditation. *State v. Richardson*, 393 N.W.2d 657, 665 (Minn.1986). Similarly, in *State v. Holliday*, 745 N.W.2d 556, 563–64 (Minn. 2008), we concluded that evidence that appellant (1) was in a group that had a "verbal confrontation" with another group, (2) pulled out his revolver after a member of the opposing group reached behind his back, (3) chased and aimed his revolver at a specific person, (4) fired multiple shots, and (5) fled the scene, were all facts supporting a finding of premeditation.

Here, the facts are remarkably similar to those in *Holliday*. Sai Vang testified that one day prior to the shootings, he obtained one of the weapons ultimately used in the shooting from Jason Moua. Witnesses testified that appellant and the other gang members initiated a verbal confrontation with the Tibetans outside the pool hall, fought with the Tibetans inside the pool hall, chased the Tibetans outside the pool hall, and fired numerous shots at the fleeing Tibetans. Tenzin Yulme and Helene Yang saw appellant chase Bunsean Lieng into the parking ramp and then saw him take aim and fire nine shots at Lieng. We conclude that sufficient evidence supported the jury's conclusion that appellant acted with premeditation.

## V.

Appellant argues that the imposition of two consecutive life sentences, fol-

lowed by four consecutive 186-month sentences, unfairly exaggerated the criminality of his conduct and that this court should remand his case for resentencing. Specifically, appellant contends that because he did not personally shoot each victim, and because his role in aiding and abetting the other defendants was essentially passive, his conduct merits a lower sentence.

We will not disturb a district court's decision to impose permissive consecutive sentences absent a clear abuse of discretion. *State v. McLaughlin,* 725 N.W.2d 703, 715 (Minn.2007). The district court abuses its discretion in imposing consecutive sentences when the resulting sentence unfairly exaggerates the criminality of the defendant's conduct. *State v. Hough,* 585 N.W.2d 393, 397 (Minn.1998). In determining whether a sentence has exaggerated the criminality of a defendant's conduct, we will take guidance from past sentences imposed on similarly situated defendants. *McLaughlin,* 725 N.W.2d at 715.

Several similarly situated cases guide our decision here. In *State v. Blanche,* 696 N.W.2d 351, 363, 379 (Minn.2005), we held that consecutive sentencing of conspiracy and first-degree murder convictions did not exaggerate the defendant's criminality given the presence of several factors:

> (1) the existence of multiple victims, both intended (Scott) and unintended (Phillips); (2) Phillips' vulnerability and complete innocence; (3) the violation of Phillips' zone of privacy; (4) the emotional and psychological devastation to the community from repeated random shootings in residential areas in an effort to assassinate Scott; (5) the harm to the community due to the senseless and brutal killing of a young and innocent child.

And in *State v. Dukes,* 544 N.W.2d 13, 20 (Minn.1996), we upheld consecutive sentences for first-degree murder and attempted first-degree murder, where the crimes involved innocent victims targeted at random and a shooting rampage that threatened innocent bystanders.

Here, appellant's crimes involved aiding and abetting the premeditated murder of innocent victims essentially targeted at random. The shootings were committed in such a way that significant risk to the community was created. The State provided evidence that stray bullets had been found lodged in houses and garages some distance from the pool hall. Finally, appellant played an active role, shooting at least one victim and aiding others in fleeing the scene. Because other defendants in similarly situated cases—namely, *Blanche* and *Dukes*—have received consecutive sentences for each victim, we conclude that the district court did not abuse its discretion in imposing consecutive sentences on appellant.

Affirmed.