STATE OF MINNESOTA

IN SUPREME COURT

A14-1182

Ramsey County

State of Minnesota,

      Respondent,

vs.

True Thao,

      Appellant.

Stras, J.

Took no part, Hudson, J.

Filed: February 24, 2016

Office of Appellate Courts

_____

Lori Swanson, Attorney General, Saint Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Peter R. Marker, Assistant County Attorney, Saint Paul, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Jennifer Workman Jesness, Assistant State Public Defender, Saint Paul, Minnesota, for appellant.

_____

S Y L L A B U S

1.     The district court's allegedly erroneous admission of evidence under Minn. R. Evid. 404(b) was harmless because it did not significantly affect the verdict.

2.     The district court did not abuse its discretion when it admitted expert testimony on gangs.

3.     The district court's jury instruction on reasonable doubt was not an abuse of discretion.

1

4.      The appellant's pro se arguments lack merit.

Affirmed.

O P I N I O N

STRAS, Justice.

A jury found appellant True Thao guilty of six counts of murder in the drive-by shooting death of Adlai Xiong and eight counts of attempted murder for the drive-by shootings of T.X. and P.L. The district court convicted him of one count of first-degree premeditated murder for the benefit of a gang, Minn. Stat. §§ 609.185(a)(1) (2014); 609.229, subd. 2 (2014), and two counts of attempted first-degree premeditated murder for the benefit of a gang, Minn. Stat. §§ 609.185(a)(1); 609.229, subd. 2; 609.17 (2014).

Thao challenges his convictions on three main grounds. First, he contends that the district court erred when it admitted evidence of a prior drive-by shooting incident that led to his conviction of attempted murder in 2000. Second, he argues that the district court erred when it permitted the State to introduce testimony on gangs from an expert witness. Third, he claims that the district court erred when it instructed the jury on the reasonable-doubt standard using language we approved in *State v. Smith*, 674 N.W.2d 398 (2004), rather than using the pattern instruction from the Criminal Jury Instruction Guide. We affirm.

I.

In the early morning hours of October 26, 2013, Xiong was shot and killed outside of the Moonshine Saloon on the east side of St. Paul. T.X. and P.L. were also present and

2

both suffered non-fatal gunshot wounds. The State's theory of the case was that Thao, a gang member, had targeted Xiong, a rival gang member, in retaliation for a fatal gang-related stabbing of another individual at the same bar 8 months earlier. Witnesses at trial identified Thao as a person who associated with, or was a member of, the Oriental Ruthless Boys ("ORB") gang. Witnesses testified that Xiong was a member of a rival street gang, the Oroville Mono Boys ("OMB").

Several hours before the shooting, Thao was at a party at a friend's house with at least eight other people. Some of the attendees, including Thao, left the party and went to the Moonshine Saloon at around 11:45 p.m. Thao drove to the bar in his 2004 dark blue Acura TL. Xiong and his friend, P.L., arrived at the bar about 45 minutes later, around 12:30 a.m. One witness who was part of Thao's group testified that, when Thao saw Xiong and P.L., he became agitated and asked if they were OMBs. The witness could not recall whether she answered Thao's question. Surveillance video showed that Thao looked at Xiong and then left the bar just a few minutes before Xiong was shot.

A bystander was outside helping a sick friend when he saw an Acura TL with distinctive, orange front-fender lights pull into an alley and park. A few seconds later, the bystander watched the Acura stop in front of the bar, heard gunfire, and then saw the victims on the ground. Based on a photograph, he identified Thao's car as the vehicle he had seen. Also, P.L., who was outside smoking with T.X. and Xiong, testified that he saw a "bluish/blackish" Acura TL pull through the alley and turn onto the street before the shooter, whom P.L. described as a "bigger" Asian male, rolled down the window and

3

fired at them. P.L. did not identify Thao as the shooter from a photographic array of six pictures, but he did consistently identify the shots as originating from Thao's car.

Xiong was shot twice in the legs and once in the head. P.L. was shot in the wrist and the thigh, and ricocheted bullets struck his back. T.X. was shot in her right shoulder, right leg, and right buttock. Police officers recovered 12 cartridge casings and 2 bullet fragments from the crime scene, but did not recover a gun. Through forensic testing, the Minnesota Bureau of Criminal Apprehension ("BCA") determined that the casings were all from the same gun and had markings that were consistent with having been ejected from a Smith & Wesson Sigma Series semi-automatic pistol.

Thao arrived at the St. Paul home of his friend, B.V., at approximately 1:30 a.m., about 15 minutes after the shooting. B.V.'s wife answered the door. At trial, she described Thao as appearing "shocked" and "spooked." Nevertheless, she gave Thao permission to clean his car in her driveway. In response to a telephone call from his wife, B.V. returned home where he found Thao in the driver's seat of the Acura. B.V. testified that Thao had appeared "surprised" to see him, and that Thao had asked if there were any police officers nearby. Eventually, Thao "told [B.V. that] he [thought] he [had] shot somebody." B.V. initially thought that Thao was joking, and inquired again. When B.V. asked Thao whom he had shot, Thao replied, "maybe some OMBs." When B.V. asked him why, Thao responded, "man, you already know." Thao told B.V. that he thought he had "f***ed up" and "shot a girl and maybe a guy." He admitted to having thrown the

gun away. Additionally, B.N., who had accompanied B.V., testified that Thao appeared shocked and talked "gibberish." B.N. overheard Thao say he "did a shoot-out."

During these conversations, Thao cleaned the driver's-side door, window, and dashboard of his Acura with Clorox-type wipes. When Thao finished, he discarded the wipes in a garbage can near B.V.'s garage. Before leaving, Thao washed his hands, apologized for frightening B.V.'s wife, and told B.V. that if they never saw each other again, B.V. had been a good friend.

The next day, police officers collected the wipes from B.V.'s garbage can. The BCA tested them and found particles consistent with the discharge of a firearm. When officers arrested Thao 3 days after the shooting, they swabbed the headliner and driver's-side window of Thao's Acura. The sample from the window contained "many" particles consistent with gunshot residue, and the headliner sample contained "a few" such particles.

Investigators used records from Thao's service provider to ascertain the approximate location of his cellphone immediately before and after the shooting. The records showed that, approximately 3 minutes before the shooting, a call from Thao's cellphone was made near the Moonshine Saloon. Another call later that morning was made near B.V.'s home. Police investigators determined that Thao's cellphone was never used again after the morning of the shooting. Thao had a different cellphone on the day of his arrest, a pre-paid device that he had activated the day after the shooting.

A grand jury indicted Thao on 14 total counts, including one count of first-degree premeditated murder for the benefit of a gang and two counts of attempted first-degree premeditated murder for the benefit of a gang. Prior to trial, the State notified the defense of its intent to offer evidence of three prior incidents: (1) Thao's 2000 conviction of attempted murder, which involved a drive-by shooting; (2) a 1998 incident in which Thao was the victim of an assault by a rival gang member; and (3) a 1997 assault for which Thao was adjudicated delinquent. The State also sought to introduce the testimony of a police officer, an expert on gangs, who would testify about his general knowledge of Hmong gangs and his specific knowledge about Thao's past gang involvement. After a hearing on the motions, the district court granted the State's motion to admit the evidence of the 2000 conviction and the expert testimony, but denied the other motions. The court explained that evidence of the 2000 conviction was admissible "because of the similarity in [modus operandi] . . . and the manner that the crime was committed as well as the efforts to hide the crime," but cautioned the State "not to argue that [Thao] . . . acted in conformity with the character that he [had] displayed in 2000." The court acknowledged that the admissibility of Thao's conviction was a close question.

At trial, the State introduced evidence regarding Thao's 2000 conviction, including that Thao had fired multiple shots with a semi-automatic pistol out of his car window at a rival gang member. The State also introduced testimony from Sergeant Richard Straka, a member of the St. Paul Police Department assigned to the FBI's Twin Cities Safe Streets Violent Gang Task Force, who told the jury that he had interviewed

Thao in 2000 in connection with a drive-by shooting, and that Thao had admitted to disposing of his gun in the Mississippi River.

Sergeant Straka also testified more generally about Hmong gangs, including the ORB and OMB gangs. He stated that gang members commonly share guns and ammunition and use gloves when handling weapons to avoid leaving DNA evidence. Straka further testified about his investigation into the 2013 stabbing of a younger brother of an ORB member at the Moonshine Saloon. Straka identified the suspects in that incident as members of the OMB gang. He also discussed the prominent role that retaliation plays in gang culture, including his opinion that the stabbing was the type of incident likely to provoke retaliation from the ORBs. Finally, Straka, who has known Thao since 1997, testified that Thao had told him in 2000 that he was a member of the ORBs. Using photographs, Straka identified three of Thao's tattoos as ORB gang tattoos.

The jury found Thao guilty of all charges. The district court convicted Thao of one count of first-degree premeditated murder for the benefit of a gang for Xiong's death, Minn. Stat. §§ 609.185(a)(1); 609.229, subd. 2, and sentenced Thao to life in prison without the possibility of release, Minn. Stat. § 609.106, subd. 2(1) (2014). The district court also convicted Thao of two counts of attempted first-degree premeditated murder for the benefit of a gang for the shootings of T.X. and P.L, Minn. Stat. §§ 609.185(a)(1); 609.229, subd. 2; 609.17, and sentenced him to concurrent terms of 236 months in prison and 240 months in prison, respectively, for those crimes.

II.

The first question presented by this case is whether the district court abused its discretion when it allowed the State to introduce evidence of Thao's prior attempted-murder conviction. Evidence of a defendant's past crimes or uncharged conduct is not admissible to show the defendant's bad character in order to raise an inference that the defendant's conduct conformed to that character. Minn. R. Evid. 404(b). However, such evidence is admissible for other purposes, including to show motive, intent, absence of mistake, identity, or a common scheme or plan. *Id.* The danger of admitting prior-bad-acts evidence, which we have referred to in Minnesota as "*Spreigl* evidence," "is that the jury may convict because of those other crimes or misconduct, not because the defendant's guilt of the charged crime is proved." *State v. Ness*, 707 N.W.2d 676, 685 (Minn. 2006); *see also State v. Washington*, 693 N.W.2d 195, 200-01 (Minn. 2005) (noting that the "overarching concern" regarding *Spreigl* evidence is its potential use for an improper purpose, such as suggesting that the defendant has the propensity to commit a crime); *State v. Spreigl*, 272 Minn. 488, 491, 139 N.W.2d 167, 169 (1965) (addressing prior-bad-acts evidence).

Thao contends that the State used the evidence regarding his attempted-murder conviction for an improper purpose under Rule 404(b): "to show that [he] was a criminal with the propensity to shoot at rival gang members." Thao also questions whether the evidence was too generic to be of much probative value, arguing that nothing from the previous crime reflected a modus operandi. The State counters that the 2000 conviction

8

established identity, one of the permitted uses of prior-bad-acts evidence, because a motivation for revenge, similar methods, and a familiarity with the disposal of firearms were present in both crimes.

To receive a new trial, Thao has to show not only that the district court abused its discretion when it admitted the evidence, but also that its admission was harmful. *See* Minn. R. Crim. P. 31.01; *State v. Sanders*, 775 N.W.2d 883, 887 (Minn. 2009). An error is harmful if there is a reasonable possibility that the "wrongfully admitted evidence significantly affected the verdict." *State v. Courtney*, 696 N.W.2d 73, 84 (Minn. 2005) (citing *State v. Bolte*, 530 N.W.2d 191, 198 (Minn. 1995)). When determining whether the admission of prior-bad-acts evidence is harmful, we have considered

> whether the district court "instructed the jury to limit the use of the other crime evidence and not to convict [the defendant] based on that evidence." We presume a jury follows a court's cautionary instruction. Other relevant considerations are whether the State dwelled on the evidence in closing argument and whether the evidence of guilt was overwhelming.

*State v. Riddley*, 776 N.W.2d 419, 428 (Minn. 2009) (alteration in original) (citations omitted). In this case, we need not determine whether the district court abused its discretion when it permitted the State to introduce prior-bad-acts evidence because, regardless of any error that may have occurred, there is no reasonable possibility that the allegedly inadmissible evidence significantly affected the outcome of the trial.

First, the district court "instructed the jury to limit the use of the other crime evidence and not to convict [Thao] based on that evidence." *Id.* Specifically, the court told the jury that "[Thao] is not being tried for and may not be convicted of any offenses

9

other than the charged offenses. You are not to convict [him] on the basis of the occurrences on April 1, 2000." The court also warned the jury that it could not use the 2000 incident to make a finding about Thao's character or to conclude that he "acted in conformity with such character." The court's cautionary instructions, taken as a whole, "lessened the probability of undue weight being given by the jury to the evidence." *State v. Kennedy*, 585 N.W.2d 385, 392 (Minn. 1998).

Second, although the prosecutor twice alluded to the 2000 incident during her closing arguments, she did not dwell on it. She stated: "[y]ou know the defendant knows how to shoot. And you know the defendant knows how to shoot from a moving vehicle. One shot, and he hit his victim before." Moments later, she reminded the jury that Thao knew how to conceal DNA evidence: "[w]e know the defendant knows this. We don't recover a gun. He - - he tries to conceal the way he looks at the scene, the way he looks after the scene, the evidence the police recover. Of course he's concealing his DNA." However, besides these two isolated references, the latter of which also finds support in Straka's general expert testimony on gangs, the prosecutor emphasized other evidence in her closing argument to persuade the jury of Thao's identity as the shooter.

Third, the State presented overwhelming evidence of guilt apart from the prior-bad-acts evidence. Witnesses identified Thao's Acura as the vehicle from which the gunshots originated. Eyewitness testimony and video surveillance showed Thao leaving the bar just minutes before the shooting. Two witnesses testified that Thao unexpectedly appeared at a friend's house in the middle of the night—approximately 15 minutes after

10

the shooting occurred—and discarded his jacket and wiped down his car. Police investigators discovered gunshot residue on the car and the wipes that Thao had used to clean the car. Cellphone evidence corroborated the other evidence of Thao's presence at the bar and at B.V.'s house. Finally, Straka and other witnesses testified that Thao associated with the ORB gang and that the shooting could have been retaliation for the stabbing that had occurred several months earlier at the Moonshine Saloon.

Accordingly, based on the entire record, we conclude that there is no reasonable possibility that the admission of evidence establishing the facts surrounding Thao's prior attempted-murder conviction significantly affected the jury's verdict. Therefore, the allegedly erroneous admission of the evidence was harmless.

III.

The second question in this case is whether the district court abused its discretion when it admitted Straka's testimony about gang culture and Thao's history of gang membership. Thao objected to the testimony because, in his view, it was cumulative to the testimony of the lay witnesses, was speculative, and improperly influenced the jury. We disagree.

The admissibility of the expert testimony turns on Minn. R. Evid. 702, which provides that an expert may testify "in the form of an opinion" if the expert's "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." We review evidentiary rulings, including those related to the admissibility of expert testimony, for an abuse of discretion. *State v. Vang*,

11

774 N.W.2d 566, 576 (Minn. 2009). The State may offer expert testimony on gangs when, as here, a defendant has been charged with committing a crime for the benefit of a gang, *id.*, and the testimony adds "precision or depth to the jury's ability to reach conclusions about matters that are not within its experience," *State v. DeShay*, 669 N.W.2d 878, 888 (Minn. 2003). The "ultimate question of admissibility [under Rule 702] is whether the expert's testimony will help" the jury evaluate the evidence or resolve factual issues. *Id.* at 884 (internal quotation marks omitted).

Five of the counts in this case required the State to prove that Thao committed the crime for the benefit of a gang. *See* Minn. Stat. § 609.229, subd. 2 (2014). Specifically, for these counts, the State had to prove beyond a reasonable doubt that Thao committed the crime "for the benefit of, at the direction of, in association with, or motivated by involvement with a criminal gang with the intent to promote, further, or assist in criminal conduct by gang members . . . ." *Id.* The focus of this case, in addition to the identity of the shooter, was the motivation for the crime and whether it related to Thao's membership in a gang.

To the extent that Straka testified about Thao and his past gang involvement, such testimony was not speculative because it was based on his first-hand knowledge. *See Deshay*, 669 N.W.2d at 886 (stating that the preferred practice for proving that a crime was for the benefit of the gang is to have witnesses with first-hand knowledge testify). Moreover, although Straka testified that the previous stabbing at the Moonshine Saloon was the type of incident likely to provoke retaliation, he did not speculate that the

12

shooting was in fact motivated by retaliation. Nor did he directly implicate Thao in the murder. *See State v. McDaniel*, 777 N.W.2d 739, 748-49 (Minn. 2010) (concluding that the admission of generalized gang evidence was helpful to prove motive).

Moreover, Straka's testimony was not duplicative of other witness testimony. No other witness testified about Thao's gang tattoos or explained that gang members share guns and ammunition and use gloves when handling weapons and bullets to avoid leaving DNA evidence. Thus, Straka's testimony describing the nature of gangs was necessary to provide context for the State's theory of the case, in addition to proving that several of the charged offenses were committed for the benefit of a gang. *See Vang*, 774 N.W.2d at 576. We have previously affirmed the admission of such testimony under similar circumstances. *See, e.g.*, *State v. Brown*, 815 N.W.2d 609, 620 (Minn. 2012) (affirming the admission of gang testimony in which the expert described Minneapolis gangs, including their participation in criminal activities); *McDaniel*, 777 N.W.2d at 748-49 (affirming the admission of similar testimony). There is no reason to reach a different conclusion in this case.

IV.

The third question presented by this case is whether the district court erred in its instruction on reasonable doubt because it used language from *State v. Smith*, 674 N.W.2d 398 (Minn. 2004), rather than the language of the pattern jury instruction. *See* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice─Jury Instruction Guides, Criminal*, CRIMJIG 3.03 (6th ed. 2015). District courts "are afforded broad discretion and

13

considerable latitude in choosing the language of jury instructions." *Smith*, 674 N.W.2d at 400 (citing *Hilligoss v. Cargill Inc.*, 649 N.W.2d 142, 147 (Minn. 2002); *State v. Gray*, 456 N.W.2d 251, 258 (Minn. 1990)). However, jury instructions, when viewed as a whole, must fairly and adequately explain the law. *Smith*, 674 N.W.2d at 400 (citing *State v. Flores*, 418 N.W.2d 150, 155 (Minn. 1988)). Although district courts may favor pattern jury instructions, their use is not required. *Flores*, 418 N.W.2d at 156.

Thao maintains that the district court's explanation of reasonable doubt implied that he had the burden to produce facts consistent with his innocence. *See Braylock v. Jesson*, 819 N.W.2d 585, 590-91 (Minn. 2012) (explaining the differences between burdens of production and persuasion). The district court, in instructing the jury, elected not to rely on the pattern language from the CRIMJIG, which states that reasonable doubt "does not mean a fanciful or capricious doubt, nor does it mean beyond all possibility of doubt." *See* CRIMJIG 3.03. Instead, it instructed the jury as follows:

> Proof beyond a reasonable doubt is that amount of proof as ordinary men and women would act upon in their most important decisions. A reasonable doubt is a doubt based upon reason and common sense. *It is not reasonable doubt if your doubt is based upon speculation or irrelevant details.*

The disputed language, which is in italics, is materially the same as the instruction on reasonable doubt that we approved in *Smith*:

> Proof beyond a reasonable doubt is simply that amount of proof that ordinary men and women rely upon in making their own most important decisions. You have a reasonable doubt if your doubts are based upon reason and common sense. *You do not have a reasonable doubt if your doubts are based upon speculation or irrelevant details.*

14

674 N.W.2d at 401 (emphasis added).

Thao does not object to the slight wording differences between the two instructions, but rather argues that the words "speculation" and "irrelevant details" in the instruction allowed the jurors to reject reasonable doubts that they formed inferentially. In other words, in Thao's view, asking the jury to disregard reasonable speculation impermissibly narrowed the standard and allowed the State to more easily convict him.

We rejected this precise argument in *Smith*. *See* 674 N.W.2d at 403. As we observed, "the word 'speculation' cannot be viewed by itself, but must be read in context and in tandem with the words 'irrelevant details,' the words with which speculation is coupled," and with the remainder of the instructions. *Id.* Viewed that way, *Smith* concluded that the inclusion of the word "speculation" did not "impermissibly narrow the reasonable doubt standard nor mislead, confuse, or misstate the law." *Id.* *Smith* is binding, and Thao provides no reason, much less a compelling one, for us to depart from its holding in this case. *See State v. Martin*, 773 N.W.2d 89, 98 (Minn. 2009) (stating that a "compelling reason" is required to overrule precedent). Accordingly, we reject Thao's claim that the district court erroneously instructed the jury on reasonable doubt.[1]

V.

Finally, Thao's pro se brief contains eight arguments that we construe as claims of prosecutorial misconduct during trial, improper admission of evidence, and ineffective

---

[1] It makes no difference that *Smith* applied the plain-error standard to review the reasonable-doubt instruction because, like *Smith*, we conclude that, regardless of the standard of review, the instruction was not erroneous.

15

assistance of trial counsel. The ineffective-assistance-of-counsel claim relates to trial counsel's failure to hire a video-surveillance expert, object to the search of Thao's cellphone records, and challenge the indictment. Thao's arguments are either unsupported by the record, premature, or devoid of citation to legal authority. *See State v. Benton*, 858 N.W.2d 535, 542 (Minn. 2015) (citing *State v. Bartylla*, 755 N.W.2d 8, 22 (Minn. 2008) ("We will not consider pro se claims on appeal that are unsupported by either arguments or citations to legal authority.")). We therefore conclude that Thao is not entitled to relief based on any of his pro se claims.

VI.

For the foregoing reasons, we affirm Thao's convictions of first-degree premeditated murder for the benefit of a gang and attempted first-degree premeditated murder for the benefit of a gang.

Affirmed.

HUDSON, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.