## STATE v. RAYMOND DOUST.

173 N. W. (2d) 337.

December 19, 1969—No. 41402.

*C. Paul Jones,* State Public Defender, and *Roberta K. Levy,* Assistant State Public Defender, for appellant.

*Douglas M. Head,* Attorney General, *Richard H. Kyle,* Solici-

tor General, and *Carl E. Erickson*, County Attorney, for respondent.

Heard before Knutson, C. J., and Nelson, Murphy, Peterson, and Frank T. Gallagher, JJ.

FRANK T. GALLAGHER, JUSTICE.

This is an appeal from a judgment of the district court adjudging defendant guilty of the crime of felonious theft.

Sometime late Saturday night, July 8, or early Sunday morning, July 9, 1967, King's Sport Store in Brainerd was burglarized. The owner, Ellis King, and his wife discovered the burglary later in the morning of the 9th. They called the Brainerd police, and Officer Robert Fitzsimmons investigated. He obtained a list from King of the stolen merchandise, which included several rifles, pistols, holsters, some clothing, and lesser items. Where it was possible, serial numbers were provided. Officer Fitzsimmons circulated the descriptions and serial numbers to surrounding law-enforcement agencies.

On July 17, Officer Fitzsimmons received a phone call from the sheriff of Crow Wing County. The sheriff told him that five rifles had been turned in at the office of the sheriff of Mille Lacs County and that the serial numbers of these rifles checked with some stolen from King's store. Fitzsimmons and two other officers went to Milaca the following day and picked up the weapons. The guns had been turned in by Dan Boyd, who, on July 9, 1967, had taken them from the back of a station wagon owned by his son-in-law, the defendant, Raymond Doust. Fitzsimmons returned to Brainerd and that same day obtained a search warrant, on his affidavit, to search 518 N. W. Third Street in Brainerd, which he knew to be the home of Raymond Doust. At 5:30 p. m. Fitzsimmons and three other officers searched the Doust home and cars. They discovered additional items taken in the King's store burglary. Doust and George Payne, who was staying at the Doust home, were arrested on July 18 and taken to the city jail. They were given a Miranda warning and booked.

The next day at 2 p. m. Fitzsimmons went to Doust's cell and Doust told him he wanted to make a statement. Doust was taken to an interrogation room and again given the Miranda warning. He agreed to waive his rights and signed a form to that effect. No stenographers were present, but Fitzsimmons took notes. Doust said that he had not stolen the property; that he was not in town when the store was burglarized; that he and his wife were out camping; and that the items found in his car and home belonged to another, whom he did not name. Fitzsimmons then accompanied Doust back to his cell. On the way back Doust made a number of incriminating statements which Fitzsimmons later wrote down.

Doust was tried on a charge of theft on December 6, 1967. The state's evidence established the burglary; that five rifles were found later that same day (July 9) in Doust's car; and that the search of the Doust home disclosed more of the stolen items. The state produced a used-car dealer who testified that Doust gave him a pistol as part payment for a car he had purchased. The serial number of the pistol was the same as one of those taken from King's store.

Defendant took the stand in his own behalf and testified that he, his wife, and his children went to a drive-in movie on July 8 and did not get home until very late. He could not remember what movie he saw, but he was sure there were at least two, and probably three. He said that he allowed George Payne, an old friend, to stay at his home during this time; that the stolen property found in his home was left there by George Payne; and that the pistol he gave to the used-car dealer was given to him by Payne in payment for letting him stay in his home. Doust's wife corroborated his story and remembered that they saw "Way Way Out" and "Think Young" that evening.

George Payne, who had previously pleaded guilty to the charge of burglary of King's store, testified that he alone broke into the store and carried off, on foot, some 320 pounds of merchandise. On rebuttal the state produced Mr. King again, who implied that

he did not believe one man could have loosened the bolt locking the store's back door. Paul Mans, part owner of the drive-in. defendant said he attended, testified that on July 8 they were showing "Tobruk" and "Gambit," and that "Way Way Out" and "For Those Who Think Young" did not start until the next day.

The jury found defendant guilty as charged. On appeal defendant raises four issues. He contends (1) that the search warrant was defective in that it listed his address incorrectly and that the items to be seized were not listed with particularity; (2) that the evidence is not sufficient to sustain the verdict; (3) that the statements made by him on July 19 were not voluntary; and (4) that the statements made by him on July 19 were not admissible because the state gave insufficient notice of its intent to use such statements as evidence.

1. The Fourth Amendment to the United States Constitution, Minn. Const. art. 1, § 10, and Minn. St. 626.08 require that before a search can be conducted a warrant must be issued upon probable cause, particularly describing the place to be searched and the items to be seized. See, State v. Campbell, 281 Minn. 1, 161 N. W. (2d) 47. Defendant contends that because the search warrant listed his address as 518 N. W. Third Street and the city engineer of Brainerd testified that the correct number should be 528, while in fact the number on the house was 524, the warrant did not describe with particularity the place to be searched.

At the Rasmussen hearing, held on September 12, 1967, Officer Fitzsimmons testified that he knew where Doust lived; that he used an old city directory to get the 518 number; that there was only one building in the block where Doust lived; and that that was the Doust house. The city engineer testified that people in that section of Brainerd often put on their houses the numbers they wanted without regard to what they should be.

In State v. Campbell, 281 Minn. 1, 9, 161 N. W. (2d) 47, 53, this court stated that it will "view the warrant in a 'common sense and realistic fashion' rather than a 'grudging or negative

attitude' that otherwise 'will tend to discourage police officers from submitting their evidence to a judicial officer before acting.' " United States v. Ventresca, 380 U. S. 102, 85 S. Ct. 741, 13 L. ed. (2d) 684. In Steele v. United States No. 1, 267 U. S. 498, 45 S. Ct. 414, 69 L. ed. 757, the Supreme Court stated that the place to be searched is sufficiently described if the officer to whom the warrant has been issued can with reasonable effort ascertain and identify the place intended.

In Hanger v. United States (8 Cir.) 398 F. (2d) 91, the court held that where the warrant listed the address of the place to be searched as 1419 and 1421 North Park, St. Louis, and in fact 1419a, 1421, and 1421a had been searched, the warrant was not defective. The officers knew which apartments were to be searched and the addresses they put down were particular enough so that they could ascertain where they were to search. This case is much stronger than that presented in Hanger. Here there was only one house in the block, so there was no chance of the police officers searching the wrong place through error. Officer Fitzsimmons, like the officers in Hanger and Steele, knew which building was to be searched. Under these circumstances the address listed in the warrant described with sufficient particularity the place to be searched in accordance with the Fourth Amendment, Minn. Const. art. 1, § 10, and Minn. St. 626.08.[1]

2. Defendant also contends that the items to be seized were not listed specifically. Officer Fitzsimmons attached to the search warrant a schedule of items taken from King's store. In most cases the items were referred to by model and serial numbers, but the list did not in all cases state what the item was— whether a pistol, rifle, flashlight, etc. In Stanford v. Texas, 379 U. S. 476, 85 S. Ct. 506, 13 L. ed. (2d) 431, the Supreme Court

---

[1] State v. Buchanan (Mo.) 432 S. W. (2d) 342, cited by the defendant on oral argument, differs on the facts from this case. Here there is only one house in the block and unlike the Buchanan case the police could not search the wrong house by mistake.

stated that the purpose of requiring that items to be seized be listed specifically is to insure that the items to be taken are not left to the discretion of the police officers conducting the search. Because the Fourth Amendment was intended to prevent general searches seeking to incriminate an accused by using his private papers, the requirement of particularity serves to limit searches to those items which the police have probable cause to believe are involved in a crime.

In the present case the items were listed with particularity, because the model and serial numbers were included. Listing the serial numbers so limits what could be seized that a general search is prevented. If the warrant is viewed "in a commonsense and realistic fashion," where the police officer listed in the warrant the items to be seized by serial and model numbers in the same manner as the owner did when describing what was taken, that is sufficient.

3. A review of the evidence presented satisfies us that it is sufficient to sustain the conviction. All the circumstances are consistent with guilt and, on the whole, inconsistent with any reasonable hypothesis of innocence. The evidence established that defendant was in possession of many of the items stolen from King's store. His alibi for the evening was shaky, because, among other things, the movies his wife claimed they had seen were shown the day after the burglary. Defendant was a good friend of Payne, who admitted committing the burglary, and had opportunity to plan it with him. The testimony of Mr. King, owner of the store, and Fitzsimmons demonstrated that it was unlikely that one man could have broken in and carried off the merchandise alone, as Payne said he did. From this and other evidence, the jury could reasonably infer that Doust had taken part in the burglary of King's store.

4. On July 19 at 2 p. m., about 20 hours after he was arrested, Doust volunteered to make a statement. He signed a waiver of his rights and gave a statement. He made further statements to Fitzsimmons while returning to his cell. Defend-

ant contends that his statements were not admissible as they were not voluntary and hence violated the due process clause of the Fourteenth Amendment. He bases his contention of involuntariness on the fact that he was arrested after a hard day's work; that he was taken immediately to jail, was not allowed to take a shower, and would not be allowed to take a shower until he confessed. He claims that in the city jail his meals were late. Officer Fitzsimmons admitted that there were no shower facilities available in the city jail, and that defendant's evening meal on July 18 was served late, but he stressed that it was Doust who wanted to make a statement.

In Frazier v. Cupp, 394 U. S. 731, 89 S. Ct. 1420, 22 L. ed. (2d) 684, the Supreme Court discussed the issue of voluntariness of statements to be used against the defendant. In that case the incriminating statements were admitted because it was found that defendant had been given a partial Miranda warning; that the questioning was of short duration; and that defendant was a person of normal intelligence and mature enough to realize what he was doing. Voluntariness is to be determined by viewing the totality of circumstances. In the present case the circumstances are even stronger for finding that the statements were voluntary. Doust was given a full Miranda warning twice, and after the second one he signed a complete waiver of his rights; it was the defendant who initiated the questioning by volunteering a statement; and there is no showing that he is not of normal intelligence or not a mature individual. Under the circumstances it was proper for the trial court to conclude that the statements were voluntary.

5. Defendant's final contention is that the statements made on July 19 were not admissible because the state failed to give adequate notice of its intention to use them as evidence, as required by State ex rel. Rasmussen v. Tahash, 272 Minn. 539, 553, 141 N. W. (2d) 3, 13, where the court stated: "At the time of arraignment when a defendant pleads not guilty, or as soon as possible thereafter, the state will advise the court as to whether its

case against the defendant will include * * * confessions or statements in the nature of confessions." At the arraignment the prosecutor failed to give notice of his intent to use the statements made by defendant. He did give notice of his intent to use evidence seized during the search. The first time the court and defendant were notified that the state intended to use these statements was near the end of the Rasmussen hearing. Defendant objected because of lack of notice and this objection was overruled. He did not ask for additional time.

The failure of the prosecutor to give the notice required by Rasmussen was not prejudicial error. The record establishes that notice was given during the Rasmussen hearing. Defendant, while he objected on grounds of inadequate notice, did not request more time to prepare to meet this evidence. In that respect this case is much like State v. Fields, 279 Minn. 374, 157 N. W. (2d) 61, where it was held that the defendant can waive his right to notice. The admissibility of defendant's statements was determined at the Rasmussen hearing after defendant had ample opportunity to bring forth any facts in his favor. This is sufficient to satisfy the requirements of Jackson v. Denno, 378 U. S. 368, 84 S. Ct. 1774, 12 L. ed. (2d) 908. Even if defendant had discovered something at the Rasmussen hearing and did not have time to develop it, there was an interval of 3 months between the Rasmussen hearing and the trial, during which period defendant could have raised an objection. Defendant did not object on any ground when this evidence was introduced at trial. These statements were first introduced at the preliminary hearing, which was held 6 weeks before the Rasmussen hearing. Therefore, it cannot be said that defendant was completely surprised when they were again introduced at the Rasmussen hearing.

From the foregoing we conclude that the defendant was not prejudiced by the prosecutor's failure to give notice prior to the Rasmussen hearing.

Affirmed.