HALBROOKS, Judge
Appellant challenges his convictions of assault with a dangerous weapon, drive-by shooting, unlawful possession of a firearm, and committing a crime for the benefit of a gang, arguing that the district court erred by failing to suppress DNA evidence and abused its discretion in admitting prior crimes and testimony from a gang expert. We affirm.
FACTS
On May 19, 2016, A.B., a member of the Bang Out Boyz (BOB), a street gang based in the Rice Street area of St. Paul, shot at T.R. because of a dispute between T.R.'s younger brother, S.L., and BOB. The dispute between S.L. and BOB began when S.L. posted a rap video critical of a gang member associated with BOB. BOB responded to the video by shooting at S.L. as they drove past him. S.L. then posted another video showing BOB that he was still alive and that included lyrics stating that he would continue rapping. BOB then created a video of D.B., a BOB gang member, rapping about how easy it was to shoot at S.L. on the freeway.
T.R. was not a gang member and disliked the fact that his brother S.L. was. Using a social-media post, T.R. attempted to discourage S.L. and BOB from escalating their dispute. The next day, T.R. noticed two males in a blue four-door car circling the block where he was driving. The passenger, A.B., made eye contact with T.R. as T.R. turned onto another street. T.R. knew A.B. T.R. stopped and heard A.B. state, "That's his brother. That's his brother." A.B. exited the blue *64 car, pointed a gun at T.R., and fired at least five times before the car sped away. T.R., unhurt, followed the car to get a license-plate number. Although T.R. was unable to get the license-plate number, he noticed a scuff mark on the car's front bumper. T.R. called 911 and informed the dispatcher that he was shot at by A.B. from a blue, four-door car and explained that A.B. had a "rap beef" with S.L.
The police met T.R. at the scene of the shooting and recovered five bullet casings. T.R. informed the police that A.B. shot at him because of an ongoing dispute between A.B.'s gang and his brother. T.R. told the police that he was not sure who drove the car but that he believed he would recognize the driver if he saw him. The police searched A.B.'s name in their system and discovered a license-plate number from a blue vehicle that A.B. was associated with from a previous police encounter. The police then drove to A.B.'s address and saw a blue Chevy Cobalt with a license-plate number that matched the number in the system parked further down the street where A.B. lived.
In order to assist, Officer Robert Lokhurst and a second officer drove to A.B.'s address and saw A.B. and another male with short dreadlocks standing on A.B.'s driveway. Officer Lokhurst recognized one male as A.B. and noticed that the other male had short dreadlocks. When Officer Lokhurst and the other officer exited the squad car and identified themselves, the two males took off running. A third officer saw the males running when he arrived in response to the call. The third officer followed them and observed that one was wearing dark clothing and carried something in his hand. The police eventually stopped both males, arrested them, and identified the man with short dreadlocks as appellant Cicero Taylor and the other as A.B. When the police brought T.R. to the scene, he identified both A.B. and Taylor as the individuals in the car.
Following the arrests of Taylor and A.B., the police found a dark-colored sweatshirt by a dumpster that the two had run past and reviewed security video from a credit union that captured them running away. The police returned to the area the next day and found a Glock handgun in the garden of a yard that Taylor and A.B. had run through. The police also searched the Chevy Cobalt and found shell casings in the car.
Based on the May 19 shooting, the state charged Taylor with one count of drive-by shooting under Minn. Stat. § 609.66, subd. 1e(a) (2014) ; one count of second-degree assault with a dangerous weapon under Minn. Stat. § 609.221 (2014) ; one count of ineligible possession of a firearm under Minn. Stat. § 624.713, subd. 1(2) (2014) ; one count of committing a drive-by shooting for the benefit of a gang under Minn. Stat. §§ 609.66, subd. 1e(a), .229, subd. 2 (2014); and one count of committing a second-degree assault for the benefit of a gang under Minn. Stat. §§ 609.222, subd. 1, .229, subd. 2 (2014).
Before trial, a St. Paul police officer applied for a search warrant to obtain Taylor's DNA in order to compare it to the DNA on the handgun. The district court authorized a search warrant. A police officer subsequently performed a buccal DNA swab on Taylor, and a Bureau of Criminal Apprehension (BCA) forensic scientist compared the DNA samples. The DNA profile on the gun excluded two-thirds of the population but did not exclude Taylor.
The state presented the DNA evidence at trial. In addition, a resident who lived in the neighborhood where the chase occurred testified that he heard two men anxiously whispering in the alley behind his house. Thinking that was suspicious, the resident told the two men that he was *65 "calling the police." In response, both men, one of whom was wearing a dark-colored sweatshirt, ran away. A second neighbor testified that she saw A.B. fire at T.R. five times. And T.R. testified about the incident and the dispute between S.L. and BOB.
The state also presented expert testimony from Officer Natalie Davis, who testified generally about gang culture, identified some of BOB's members, discussed the BOB rap video, stated that rap videos disrespecting other gangs are the type of incident likely to provoke retaliation, and discussed the dispute between S.L. and BOB. In addition, the state played the video that showed D.B. rapping about shooting at S.L.; a video showing Taylor and A.B. running past a credit union during a police chase; and a squad-car video showing A.B. asking Taylor whether he "stashed that b-tch good" immediately after they were arrested. The state also admitted into evidence photos of Taylor and BOB members.
A jury found Taylor guilty of all counts. The district court sentenced Taylor to 129 months for the committing-a-crime-for-the-benefit-of-a-gang conviction and to a concurrent 60 months for unlawful possession of a firearm. This appeal follows.
ISSUES
I. Did the district court err by failing to suppress Taylor's DNA that was acquired as a result of a search warrant that mistakenly included the name of a person not involved in the case?
II. Did the district court abuse its discretion by admitting evidence of a prior drive-by shooting committed by BOB?
III. Did the district court abuse its discretion by admitting Officer Davis's expert testimony regarding gangs?
IV. Is Taylor entitled to relief on any of his pro se claims?
ANALYSIS
I.
Taylor argues that the district court erred by not suppressing DNA evidence that the police obtained pursuant to a search warrant that mistakenly included the name of a person not involved in the case. The search-warrant application properly stated Taylor's name, his date of birth, and the grounds for the warrant. The district court issued a search warrant, stating:
[The officer] ... has ... made application to the said Court applying for issuance for a search warrant to search the following described person:
* Cicero Deshawn TAYLOR (07/12/1993)
* Ramsey County Law Enforcement Center, MN
located in the City of Saint Paul, County of Ramsey, STATE OF MINNESOTA for ... [a buccal DNA swab].
....
The Court further finds that probable cause exists to believe that the above-described property and things are on the person of Cicero Deshawn TAYLOR (07/12/1993)
But in the final section of the warrant, the district court mistakenly included the name of an uninvolved person, stating:
Therefore ... the Peace Officers ... are hereby commanded between the hours of 7 a.m.-8 p.m. to search the person of [D.L.H.] for the above-described property and things, to seize said property and things, and to retain them in custody subject to Court order and according to Law.
Based on the warrant, the police obtained a buccal swab from Taylor. Taylor moved the district court to exclude the *66 DNA evidence, arguing that the police did not obtain the DNA pursuant to a valid search warrant. Taylor specifically argued that the warrant failed to satisfy the particularity requirement of the Fourth Amendment because it identified Taylor but also referred to someone other than Taylor. The district court denied Taylor's motion to suppress the evidence.
"We review evidentiary rulings of the district court ... for abuse of discretion. But whether an evidentiary ruling violates a defendant's constitutional rights is a question of law we review de novo." State v. Anderson , 789 N.W.2d 227, 234-35 (Minn. 2010) (citation omitted). The Minnesota Constitution requires that every warrant describe the place to be searched with particularity. Minn. Const. art. I, § 10. The particularity requirement's purpose is "to minimize the risk that officers executing search warrants will by mistake search a place other than the place intended by the magistrate." State v. Gonzales , 314 N.W.2d 825, 827 (Minn. 1982) (quotation omitted). But not all errors in the description of the place to be searched invalidate a search. Id.
Our review of the caselaw has not revealed any Minnesota case that addressed whether a search warrant satisfied the particularity requirement when it mistakenly included the name of an incorrect person to be searched in addition to accurate information. But we are guided by multiple cases that have addressed whether a search warrant satisfied the particularity requirement when it incorrectly identified the place to be searched. See, e.g. , id. (holding that a search warrant that stated an incorrect street name satisfied the particularity requirement, concluding that the officer could reasonably locate the intended house because the warrant listed the correct house number, another person pointed the officer to the correct house, and the correct street was located by the street listed on the search warrant); State v. Kessler , 470 N.W.2d 536, 539 (Minn.App. 1991) (determining that a search warrant listing an incorrect house number satisfied the particularity requirement when the defendant did not suffer prejudice, the officers searched the correct house, and an informant led the officers to the correct house). "The test for determining the sufficiency of the description of the premises is whether the description is sufficient so that the executing officer can locate and identify the premises with reasonable effort with no reasonable probability that [other premises] might be mistakenly searched." State v. Schnorr , 346 N.W.2d 380, 382 (Minn.App. 1984) (alteration in original) (quotations omitted). We view search warrants in a "commonsense and realistic fashion." State v. Doust , 285 Minn. 336, 341, 173 N.W.2d 337, 340 (1969).
Here, in admitting the DNA evidence, the district court determined that "there was no risk that the officers would be executing the search warrant by mistake on the person who was named in the search warrant." We agree. The district court properly relied on Schnorr to determine by analogy that the warrant sufficiently identified Taylor as the person to be searched. Although the search warrant mistakenly included an uninvolved person's name in a conclusory fashion at the end of the warrant, the majority of the text provided Taylor's complete name, date of birth, and location. Because there was no reasonable probability, based on the entirety of the search warrant, that another person might have been mistakenly searched, we conclude that the search warrant satisfied the particularity requirement and was valid under the Fourth Amendment. Schnorr , 346 N.W.2d at 382-83.
II.
Taylor argues that the district court abused its discretion by admitting *67 evidence of BOB's prior incident involving shooting at S.L. The district court allowed the state to admit the testimony concerning the shooting as evidence of the gang's violence and Taylor's motivation, but it would not allow the state to use it as Spreigl evidence against Taylor.
We review a district court's evidentiary ruling for abuse of discretion. State v. Guzman , 892 N.W.2d 801, 812 (Minn. 2017). "To obtain reversal of an evidentiary ruling on appeal, the appellant must show both that the district court abused its discretion in admitting the evidence and that the appellant was thereby prejudiced." Id. (quotation omitted).
Despite the district court's ruling limiting the state's use of the evidence, Taylor contends that the state used the incident of BOB's prior attempt to shoot S.L. as Spreigl evidence because the state implied that Taylor was involved in the prior shooting. Generally, evidence of a person's character is not admissible to prove that the person acted in conformity with that character trait, but prior acts may be admitted to prove "motive, opportunity, intent, [and] preparation." Minn. R. Evid. 404. The prosecutor may not admit prior bad-acts evidence, known as Spreigl evidence, see State v. Riddley , 776 N.W.2d 419, 424 (Minn. 2009), unless (1) the prosecutor gives notice of its intent consistent with the rules of criminal procedure, (2) the prosecutor clearly indicates what the evidence will be offered to prove, (3) the other act and the individual's participation in it is proven by clear and convincing evidence, (4) the evidence is relevant, and (5) its probative value is not outweighed by its potential for unfair prejudice, Minn. R. Evid. 404(b).
But the state did not present evidence that showed that Taylor was involved in the prior shooting. T.R. testified about BOB's prior attempt to shoot S.L., but he never stated that Taylor was involved in the shooting. Officer Davis also testified about BOB's attempt to shoot S.L., but she did not mention Taylor. Officer Davis identified Taylor as being in the background of the video that showed D.B. rapping about shooting at S.L. But Taylor's presence in the video, by itself, did not implicate him in the prior shooting. Multiple gang members are in the video, flashing gang symbols, and D.B. is the only one rapping. And in the four-minute video, there are only a couple of scenes of a few seconds' duration in which Taylor is the central figure. Because the evidence of the prior shooting related only to BOB's prior actions, and not to a prior act committed by Taylor, we conclude that the evidence was not improperly used by the state as Spreigl evidence.
But that determination does not end our analysis. Even if evidence is not offered as Spreigl evidence, it must be relevant, and its probative value cannot be substantially outweighed by the danger of unfair prejudice. Minn. R. Evid. 403. The evidence of the prior shooting was highly relevant to Taylor's charge of committing a crime with the "intent to promote, further, or assist in criminal conduct by gang members." Minn. Stat. § 609.229, subd. 2. The state needed to prove that BOB is a criminal gang, that Taylor is a member of that gang, and that he committed the crime for the benefit of the gang. See id. ; State v. Matelski , 622 N.W.2d 826, 832 (Minn.App. 2001), review denied (Minn. May 15, 2001). "[E]vidence of criminal activity by other gang members[ ] is admissible to prove that the defendant committed a crime for the benefit of a gang." Matelski , 622 N.W.2d at 832.
The state presented evidence of BOB's prior attempt to shoot S.L. to demonstrate that Taylor's involvement in the drive-by shooting involving T.R. was done for the *68 benefit of BOB, based on its ongoing dispute with S.L. The probative value of the evidence was not substantially outweighed by the risk of unfair prejudice because it allowed the state to prove an essential element of the crime that Taylor was charged with. We therefore conclude that the district court did not abuse its discretion by denying Taylor's pretrial motion to suppress evidence related to BOB's prior shooting.
III.
Taylor contends that the district court abused its discretion by admitting Officer Davis's expert testimony about gangs because it was duplicative, prejudicial, and not helpful to the jury. We review evidentiary rulings on expert testimony regarding gangs for abuse of discretion. State v. Vang , 774 N.W.2d 566, 576 (Minn. 2009).
Minn. R. Evid. 702 allows "a witness qualified as an expert by knowledge, skill, experience, training, or education" to testify in the form of an opinion if her "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." The supreme court has held that the state may offer expert testimony when a defendant has been charged with committing a crime for the benefit of a gang. Id. But the need to prove that a defendant was involved in a criminal gang "does not open up the door to unlimited expert testimony." State v. DeShay , 669 N.W.2d 878, 886 (Minn. 2003). Expert testimony should not be used if the issue can be resolved by the jury by applying principles of general or common knowledge. Id. at 885. The expert testimony must "add precision or depth to the jury's ability to reach conclusions about that subject which is within [the expert's] experience." Vang , 774 N.W.2d at 579 (quotation omitted). And testimony that may otherwise be acceptable under Minn. R. Evid. 702 should nevertheless be excluded if its probative value is substantially outweighed by its prejudicial effect. DeShay , 669 N.W.2d at 888 (citing Minn. R. Evid. 403).
A. Helpfulness of Officer Davis's Testimony
Taylor first argues that the district court should not have admitted Officer Davis's testimony because it was duplicative of other evidence and was not helpful to the jury. Expert testimony on gang evidence should not duplicate lay witness testimony. State v. Cruz-Ramirez , 771 N.W.2d 497, 506 (Minn. 2009). In DeShay , the supreme court held that a district court erred in admitting expert gang testimony when the expert testified to evidence that witnesses with first-hand knowledge had already testified to, including the defendant's association with three or more people; the group's geographic origin; the group's relation to other gangs; that the group's primary activity was drug trafficking; that the group relied on drug addicts for profits; and that the group used gang terms, signs, and names. 669 N.W.2d at 886. The supreme court concluded that the expert's testimony was largely duplicative in the context of a non-complex drug conspiracy case and provided little assistance to the jury in evaluating the evidence. Id. ; see also State v. Lopez-Rios , 669 N.W.2d 603, 612 (Minn. 2003) (holding gang-expert's testimony was erroneously admitted because the expert opined that the defendant was a member of the gang and because it was largely duplicative of previous witness testimony).
But in State v. Jackson , a gang expert testified generally about the Bloods gang, identifying gang hand signs and colors, the members' involvement in criminal activity, and the role of respect and intimidation in *69 the gang culture. 714 N.W.2d 681, 689 (Minn. 2006). The supreme court held that this testimony was not excessive and aided the jury in determining whether one of the Bloods's primary activities consisted of committing crimes-an element that was necessary to prove that the Bloods met the statutory definition of a gang. Id. at 692-93.
In this case, some of Officer Davis's testimony was arguably duplicative of other testimony. Officer Davis testified about BOB's rap video and S.L.'s dispute with BOB. She also explained D.B.'s rap lyrics to the jury. T.R. testified about these matters as well. But most of Officer Davis's testimony was not duplicative. She provided the jury with a history of BOB and explained that it is a west-affiliated gang within a larger umbrella of the Cripps gang in the Rice Street area. She testified about BOB gang signs; the number of members in the gang; the role of tattoos in gang culture; the role of respect, retaliation, and social media; the gang's involvement in "homicide, aggravated assault with a weapon, drive-by shooting, shots fired, CSC, terroristic threats, auto theft, [and] domestics"; and that BOB is in conflict with all "east facility gang[s]." She also explained the nine criteria for determining whether someone is a gang member.
Taylor specifically argues that Officer Davis's testimony about BOB's prior crimes was not helpful to the jury. Taylor was charged with committing a crime for the benefit of a gang; "criminal gang" is defined in Minn. Stat. § 609.229, subd. 1(1) (2014), as a group that "has, as one of its primary activities, the commission of one or more of the offenses listed in section 609.11, subdivision 9," which includes murder, assault, drive-by shooting, and criminal sexual conduct, Minn. Stat. § 609.11 (2014). We conclude that Officer Davis's testimony "assisted the jury in deciding whether the commission of crimes is one of the primary activities of [BOB], a prerequisite for proving that the ... gang meets the statutory definition of a criminal gang." Jackson , 714 N.W.2d at 692 (quotation omitted).
B. Prejudicial Effect of Officer Davis's Testimony
Taylor next argues that Officer Davis's testimony was highly prejudicial because it substantially influenced the jury's decision and dissuaded the jury from exercising its own discretion. A gang expert should not testify as to the ultimate issue of whether the defendant committed a crime for the benefit of a gang. Id. at 691.
The supreme court recently determined that a district court did not abuse its discretion by admitting gang expert testimony when the expert stated that a prior incident would likely provoke retaliation but did not speculate as to whether the incident at issue was in fact motivated by retaliation. State v. Thao , 875 N.W.2d 834, 841 (Minn. 2016) ; see State v. McDaniel , 777 N.W.2d 739, 748-49 (Minn. 2010) (holding that the district court properly admitted gang expert testimony because it "described gang culture generally, and the role of retaliation and respect in gang culture," even though other witnesses testified that the defendant was part of the gang, because "[the expert] did not offer his opinion regarding whether the murder of [the victim] was rooted in gang retaliation and did not directly implicate [the defendant]"); State v. Yang , 774 N.W.2d 539, 556 (Minn. 2009) (stating that the expert "expressed his opinion that the primary activities of the [gang] were to commit violent crimes and to protect each other. Because he was not asked to express an opinion on the ultimate issues in *70 the case, we conclude that the district court did not abuse its discretion.").
Here, Officer Davis testified that Taylor associated with gang members and identified Taylor in BOB's rap video. Officer Davis also identified Taylor in a photograph and commented that he was "throwing down the east" gang sign while standing next to gang members whom she had already identified. But when Taylor's attorney asked Officer Davis whether she had a report that identified Taylor as a gang member, Officer Davis testified that she did not have a report with her that contained that information. Officer Davis did not testify that Taylor, himself, was a gang member.
Taylor also contends that Officer Davis testified to the ultimate conclusion of whether the incident involving T.R. was motivated by retaliation based on the following exchange between the prosecutor and Officer Davis:
[Prosecutor]: And then how common are these videos?
[Officer Davis]: Geez, I mean, so common. There's new ones popping up all the time. I would say maybe one artist can release, I don't know, three videos in one month. Sometimes it will only be one. Sometimes it can be up to five. It depends on what's going on and who is doing what. So what crimes have been committed and who is mad at who. And then you can always expect that there will [be] one to follow. There will be an incident to follow.
Q: Why-what do you mean there's an incident to follow? Incident to follow what?
A: Okay. So if I'm the rapper and I'm calling out-I'm calling out my oppositional gang, and I'm calling out other things that we've done to you that we might have not been caught by the police, and I'm disrespecting you. The opposition then we can expect that there is going to be retaliation. Otherwise, they're going to be perceived as weak. They didn't take care of their business.
Q: So these calling out, they're not just in the form of videos, they translate into real life?
A: Totally.
In this exchange, Officer Davis described the role of retaliation and respect within the gang culture and expressed her opinion that gangs commit crimes to protect their reputation. But Officer Davis never stated that Taylor assisted A.B. in shooting at T.R. in order to retaliate. "Because [the expert] was not asked to express an opinion on the ultimate issues in the case," id. , the district court did not abuse its discretion in admitting Officer Davis's expert testimony. Instead, Officer Davis's testimony helped the jury evaluate whether Taylor was guilty of committing a crime for the benefit of a gang. The supreme court has noted that most evidence introduced to prove that a defendant committed a crime for the benefit of a gang will likely "be improperly prejudicial to some degree by suggesting guilt based on gang membership alone. But prohibiting all such evidence would frustrate the legislature's purpose in enacting section 609.229 by rendering convictions under it nearly impossible to obtain." Jackson , 714 N.W.2d at 692. While Officer Davis's testimony about gang culture may have posed some risk of prejudice, we conclude that the testimony's significant probative value outweighed any such prejudice under Minn. R. Evid. 403.
C. Hearsay Issue within Officer Davis's Testimony
Taylor also argues that Officer Davis's testimony regarding Taylor's prior association with the Chevy Cobalt constitutes *71 hearsay. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Minn. R. Evid. 801(c). Hearsay is inadmissible unless it falls within an exception. Minn. R. Evid. 801, 803. When relying on gang expert testimony, the state is not "permitted to launder inadmissible hearsay evidence, turning it into admissible evidence by the simple expedient of passing it through the conduit of purportedly 'expert opinion.' " DeShay , 669 N.W.2d at 886.
At trial, the prosecutor asked Officer Davis about Taylor's connection to the Chevy Cobalt identified in the shooting. Taylor's attorney objected to the statement as hearsay, but the district court overruled the objection without providing its reasoning on the record. Officer Davis then stated, "They were seen prior to this incident in it together on southbound Highway 52." She later explained that she learned this information through a field interview with another officer. We agree with Taylor that Officer Davis's statement was hearsay because it was made by another police officer and offered to prove that Taylor was previously associated with the car.
But Taylor must also demonstrate that he was prejudiced by the statement's admission. State v. Amos , 658 N.W.2d 201, 203 (Minn. 2003). "The [e]rroneous admission of evidence that does not have constitutional implications is harmless if there is no reasonable possibility that the wrongfully admitted evidence significantly affected the verdict." State v. Holliday , 745 N.W.2d 556, 568 (Minn. 2008) (alteration in original) (quotations omitted). We conclude that Officer Davis's statement about Taylor's prior association with the Chevy Cobalt did not significantly affect the verdict because there was substantial evidence that Taylor was involved in the drive-by shooting involving T.R.: (1) a witness identified Taylor running from the police after the shooting; (2) T.R. testified that Taylor drove the car; (3) another officer testified that T.R. identified Taylor as the driver shortly after Taylor was arrested; (4) video from a nearby credit union showed Taylor running through the area during the police chase; (5) in the squad-car video, A.B. asked Taylor whether he stashed the evidence; (6) the state presented photographs showing Taylor associated with other members of BOB; (7) the rap video showed D.B. rapping about S.L. and BOB's ongoing dispute; and (8) expert testimony from Officer Davis established that Taylor was associated with BOB. Because Taylor has not demonstrated that he was prejudiced by the admission of the hearsay statement, he is not entitled to relief on this basis.
IV.
In Taylor's pro se supplemental brief, he argues that the district court erred by failing to suppress the DNA evidence, permitting Spreigl evidence of other BOB crimes, and failing to exercise its "fiduciary obligation" to strike a juror. Taylor also alleges that the testifying police officers improperly communicated with each other during trial and that the prosecutor failed to timely provide a transcript of the rap video. Taylor does not cite any evidence in the record or relevant legal authority to support these claims. See State v. Sontoya , 788 N.W.2d 868, 876 (Minn. 2010) (declining to address a pro se claim on the merits where the pro se defendant did not cite in his pro se brief either the record or legal authority); State v. Bartylla , 755 N.W.2d 8, 22 (Minn. 2008) (noting that "[w]e will not consider pro se claims on appeal that are unsupported by either arguments or citations to legal authority"). We therefore decline to address these arguments.
DECISION
Because the search warrant that resulted in the DNA evidence satisfied the constitutional *72 requirement of particularity, the district court did not err by denying Taylor's motion to suppress the evidence. Further, the district court properly exercised its discretion by admitting evidence of BOB's prior crimes and the expert's testimony concerning gang culture.
Affirmed.